### FULLER v. VENABLE et al.

(Circuit Court, D. Maryland.  April 1, 1901.)

STREET RAILROAD—MORTGAGE—FORECLOSURE AND REORGANIZATION — RIGHTS
OF BONDHOLDER.

A committee having charge for first mortgage bondholders of the
foreclosure sale and reorganization of a street-railroad company were au-
thorized to purchase the road and other property for their benefit, and
organize a new corporation to operate it.  The bonds concerning which
the agreement related were bonds on which there had been a general de-
fault on May 1, 1897, and the bondholders agreed to surrender such bonds
to the committee, and that the latter should "use the said bonds and
coupons" to pay for the property purchased.  Bonds were deposited, sub-
ject to an order of the committee, pursuant to an agreement under which
the holders of receipts for bonds were "entitled to receive for each bond
deposited a new noncumulative income mortgage bond [against the new
company] for each bond deposited."  One of the depositors, though con-
senting to the reorganization as planned, detached and retained coupons
maturing on and after May 1, 1897, and subsequently collected the same
from the proceeds of the mortgage sale; thereby obtaining more for him-
self than the other bondholders, who deposited such coupons for the com-
mittee's use in purchasing under the foreclosure.  *Held*, that he could
not claim bonds against the new organization in the hands of the com-
mittee without producing or surrendering the defaulted coupons which
he detached, or paying the money collected therefor out of the proceeds
of the foreclosure.

In Equity.

Thomas W. Miller, for complainant.
Edwin G. Baetjer and Charles McN. Howard, for defendants.

MORRIS, District Judge.   This is a bill in equity filed by the com-
plainant, Fuller, against Venable, Spence, and Graves, a bondholders'
committee, having in charge for the bondholders the sale by foreclos-
ure and the reorganization of the Roanoke Street-Railway Company.
The bill of complaint is in the nature of a bill to enforce a trust, or to
enforce specific performance of an agreement, and the prayer of the
bill is that the defendants be required to perform their duty to the
complainant by delivery to him, without condition or reservation, the
second mortgage bonds of the Roanoke Electric & Power Company,
amounting to $21,000, to which the complainant claims to be entitled
as the holder of the deposit certificates for first mortgage bonds of
the Roanoke Street-Railway Company, deposited with the Mercantile
Trust & Deposit Company of Baltimore under an agreement dated
January 10, 1898, between the defendants and the bondholders of the
Roanoke Street-Railway Company.   The question involved is whether
or not the complainant can be required by the defendants, as a con-
dition of his obtaining from them $21,000 income bonds of the new
company, to produce and surrender certain defaulted coupons which
had been detached from the old bonds before they were deposited, or
be required to pay the money collected by the complainant for those
coupons out of the proceeds of the foreclosure sale, or whether the
complainant is entitled to keep the money and to demand and receive
the new bonds unconditionally.

The rights of the complainant are not based upon the $21,000 of old

bonds which the complainant originally held. Those bonds he confided to a Mr. Trout to deposit for him under the terms of the agreement between the depositing bondholders and the defendants, first detaching from each bond three semiannual unpaid interest coupons, due as follows, viz. May 1, 1897, November 1, 1897, and May 1, 1898. The bonds were deposited, and the complainant obtained therefor certificates of deposit from the Mercantile Trust & Deposit Company of Baltimore, reciting that each bond had been deposited subject to the terms of the agreement of January 10, 1898, between the defendants and the bondholders, and subject to the order of the defendants, or a majority of them, and that the holder of the certificate assented to the agreement by receiving the certificate. It is clear, therefore, that the complainant can enforce only such rights as he is entitled to under the proper construction of the agreement, and that he is affected by all the equities which the bondholders' agreement gives rise to. The purpose of that agreement was primarily to bring about a foreclosure of the mortgage securing the deposited bonds, and it authorized the defendants to represent the owners in all proceedings instituted for the collection of the bonds, "and to do whatever acts in their judgment may be necessary or desirable for the protection of the interests of the said bondholders." By the agreement, the defendants were authorized to purchase the railway, and also the property, of the Roanoke Electric Light & Power Company, or other property, for the benefit of the holders of the bonds deposited, and to organize a corporation to own and operate the property purchased. In case of purchase by the defendants of the properties mentioned, they were authorized to use the deposited bonds and coupons in making payment therefor, and it was provided that the defendants should have power to mortgage or pledge the properties purchased to carry out any plan of reorganization that might be adopted. It was further stipulated that in any plan of reorganization provision should be made for issuing new first mortgage bonds sufficient to pay the claims of creditors and the expenses of the foreclosure and reorganization proceedings, and that the holders of the old mortgage bonds should receive for each bond deposited a new noncumulative income mortgage bond, junior only to the before-mentioned first mortgage bonds.

It is conceded in the agreed statement of facts that it was the intention of the defendants, acting as said committee, and of the parties actively engaged in the attempt to reorganize the company under the agreement and plan of January 10, 1898,—and that they formulated their plan upon the basis,—that no payment or compensation was to be made for the bonds deposited under said agreement other than the delivery of the new income bonds, nor for the coupons maturing May 1, 1897, and subsequently, and that all the depositors except the complainant did either deposit with their bonds all the coupons then unpaid, including the coupon maturing May 1, 1897, or, upon being notified to do so, did afterwards deliver the same to the said Mercantile Trust & Deposit Company. Proceedings to foreclose the mortgage were instituted by the trustees named therein, and by a decree passed May 1, 1899, commissioners were appointed to sell the mortgaged property, and they were directed, after the payment of costs

and certain preferred claims, to apply the proceeds of sale to the payment of all coupons then due (the mortgage having specially provided that in case of sale the coupons should be preferred to the principal of the bonds), and to apply the residue to the principal of the bonds ratably. The defendants, as such committee, purchased said property at the foreclosure sale for $150,000, and the power company property for $31,000, and settled for said property, using in said settlement the bonds deposited with said trust company, and all the coupons deposited therewith, including complainant's bonds and coupons. Soon after the confirmation of the sale, the attention of defendants was for the first time called to the fact that the coupons due May 1, 1897, November 1, 1897, and May 1, 1898, had not been deposited with complainant's bonds, but had been retained by him, and the complainant was notified by them that no provision had been made under the reorganization agreement for payment to depositing bondholders of the coupons due May 1, 1897, and subsequently, and that the complainant could not participate equally with the other depositing bondholders in the issue of income bonds of the new company, unless he first put himself on an equal footing with all the other depositing bondholders by either depositing the coupons retained, or by refunding the money he might collect for them under the decree out of the proceeds of sale. The complainant refused to accede to the defendants' contention as to his rights, and collected, in payment of his retained coupons, from the commissions out of the proceeds of sale, the sum of $2,115.96.

After the consummation of the purchase of the properties acquired by the defendants as a committee, they called a meeting of the depositing first mortgage bondholders and certain preferred stockholders, at which it was explained that the bad physical condition of the properties required expenditures, which, with the expenditures provided for by the bondholders' agreement, required an increase in the issue of new first mortgage bonds, and thereupon a plan of reorganization was formulated, and issued to the depositing bondholders, dated November 20, 1899, which provided for the issue of $300,000 first mortgage 5 per cent. bonds, $190,000 income noncumulative 4 per cent. bonds, and $200,000 of capital stock, and stated that the income bonds would be distributed to the depositors of the old bonds who had deposited their bonds, together with all the coupons maturing on and after May 1, 1897, or who, in order to equalize all holders of said bonds, refunded the cash received for the retained coupons from the commissioners who made the sale of the Roanoke Street-Railway Company.

It is to be noticed that the bill of complaint does not seek to modify or attack in any way the plan of reorganization which was in fact carried out by the defendants as a committee, nor to question their authority and power, in the emergency presented by the insufficient physical condition of the properties, to increase the issue of the new first mortgage 5 per cent. bonds beyond the amount contemplated by the agreement of January 10, 1898. On the contrary, the bill of complaint sets out and relies upon all that has been done by the committee, and avers that the securities contemplated, dated December

1, 1899, have been issued, and that nearly all the income bonds have been issued and delivered to the holders of the certificates of deposit, and that the committee have in their possession, and are without right withholding from the complainant, the $21,000 of income bonds to which he is entitled as the holder of his certificates of deposit. The complainant relies upon his certificates of deposit, and upon what the committee has done, as entitling him to come in with the other holders of certificates, and get his share of what has resulted from the plan which was carried through by the committee for the equal benefit of himself and all the other holders of like certificates.

It seems to me that the mere statement of the case discloses the inequality which would necessarily result from yielding to the complainant's demand. It simply would result in his obtaining on his $21,000 of certificates $2,115 more than any other holder of a like amount of certificates. No such result could have been contemplated by the other depositing bondholders, and no such result is provided for by the stipulation of the bondholders' agreement. The agreement was entered into with reference to an issue of defaulted bonds, upon which the interest had ceased to be paid when the coupon of May 1, 1897, matured. That was the subject-matter of the whole agreement, and those were the bonds which all depositors were to surrender into the hands of the committee, in order that the action taken for the common benefit should be uniform, and that the committee should "use the said bonds and coupons" to pay for the property proposed to be purchased. Mutuality, equality, and community of interest among all those who contributed their bonds to the scheme was necessarily the fundamental principle of the plan of associating all the bondholders together for joint action. How could it be possible, without the clearest stipulation, and upon some special consideration, consented to by all the others, that one stockholder could be allowed, by simply retaining his coupons, to obtain for himself over $100 more for each bond than the other depositors.

The complainant rests his demand upon the phrase of the agreement, "Holders of receipts for bonds  * * *  shall by said plan be entitled to receive for each bond deposited a new noncumulative income mortgage bond." But I think he ignores the fact that the bonds concerning which the agreement was made were defaulted bonds, on which there had been a general default on May 1, 1897, and it was those bonds which the committee were to have and use, and not a less valuable bond, from which the holder, before depositing, had detached the coupons. It is plain that such a construction as the complainant contends for would bring about a result so unequitable that a court of equity would not lend itself to its enforcement by a decree for specific performance; and, if the bill be regarded as an application to enforce the execution of a trust, that the defendants neither contractually nor impliedly came under an obligation to treat, in the distribution of the results of the plan of reorganization, one bondholder differently from another, but, on the contrary, their duty is, in executing their trust, to treat all equitably and ratably, giving to each a return exactly proportioned to the securities actually deposited by each. The bill will be dismissed.